My name is Dan Markell and I represent Jonathan Gordon. I'd like to reserve 90 seconds of time for rebuttal and I will split my 20 minutes with Mr. Hoffman, who is representing Stephen Gordon. Your Honors, we're here today for a very simple reason in a complex case. My client was wrongly convicted and wrongly sentenced in violation of his constitutional rights. I'd like to begin my presentation with the strongest evidence the government has against Jonathan and demonstrate to you why that evidence does not withstand the relevant standard here, which is whether a reasonable jury could find, beyond a reasonable doubt, that Jonathan had the specific intent to defraud or to commit any criminal wrongdoing. As you know, there are essentially three types of conduct at issue here. Honest services, check-kiting, and false statements. I'd like to begin with the honest services scheme. First, did Jonathan Gordon have the intent at any point to defraud Merrill Lynch of his honest services, counts 4 through 8? Amazingly, the government's brief did not actually even point. But as we argued in our opening brief, these counts are utterly without logical foundation. The government relies on three types of evidence. The alleged – Wait a minute. Let me get this straight. Now, your client is the Merrill Lynch employee? That's correct. Go ahead. Okay. There were three types of evidence that the government relied upon to show – I'm sorry, two types of evidence to show this particular honest services scheme. One is the alleged bribes that Jonathan was receiving from Stephen from January 2000. And the second is the concealment of the receipt of these funds from Merrill Lynch. The payments, starting with the so-called bribes, these payments began even on the government's theory in January of 2000. That was well before Karen Smith, Jonathan's manager at Merrill accounts that were used for Stanley Media. That was nine months before any of the alleged check hiding occurred. So without any evidence, the government's theory requires a leap of logic in which an innocent stream of payments between one brother and another brother transmogrifies into a series of illicit bribes designed to corrupt Jonathan and prevent him from giving his uncompromised loyalty to Merrill Lynch. What's more, the government never offered a scintilla of evidence in the court below to contest the simple fact that these payments were part of a history of loans between these two brothers and that the $340,000 that Stephen lent to Jonathan was in advance of a signing bonus that Jonathan was expecting when he was planning on moving brokerage houses for moving his book of business to a different brokerage. That's in the ER 2268. Well, you know, I think that's all obviously, I think, at least a plausible interpretation of the evidence. But that's not the only interpretation. Well, there's no other evidence that the government offered to challenge or contest whether or not Jonathan was expecting a substantial signing bonus and that Stephen at the time was a wealthy individual and he was helping his brother with a bridge loan for his house. Now, it's from my client's family, the money that was owed. Now, I'd be happy to, you know, get some type of an affidavit to that, you know, to that effect. More importantly, the vast majority of the funds were transferred well before Merrill Lynch precipitated a cash crunch at Stan Lee in October of 2000, right? The $203,000 check occurred, which was the lion's share of the funds that were transferred, was done in early September 2000, well before any of the cash crunch occurred. And there were payments occurring starting in January, which was four or five months before the margin accounts were ever created. It just doesn't make sense that this stream of payments between the brothers would, in fact, form the motivation for the corrupt services. The second aspect that the government relies on is that they say that the government claims Merrill Lynch was deceived. That's simply not true. Merrill Lynch knew that Jonathan was getting money from his brother. Merrill Lynch's files reveal that the payments were loans for escrow. Karen Smith, Jonathan's manager, knew that Jonathan was getting money from his brother and she said that he was very forthright about it and not at all evasive. That's in the ER 20 colon 5. There was nothing wrong, moreover, with getting money at other bank accounts. The government alleges that something was wrong with that. But in fact, Karen Smith, again, she testified, ER 20 colon 47, that only trading accounts have to be at Merrill Lynch. Personal accounts could be anywhere and Merrill Lynch had no policy placing an upper limit on the kinds of loans that could be placed between brothers, one of whom was a Merrill Lynch employee. Turning to the second scheme, the bank fraud through check hiding, the government's evidence, again, was that the money that Jonathan received through the year, which I've already addressed, the capital management account declines that Jonathan allegedly overrode on his own and the failure to alert Smith that the margin accounts were simply mailbox companies. So let me address the CMA declines which come up. Each bit of the evidence that the government relies on here is flawed and the CMA declines is no different because Karen Smith, again, her testimony is crucial to understanding the context here. She testified at ER 20 colon 38 that she was the hands-on overseer of the accounts after the Preston email that precipitated the cash crunch in October. She testified that she was overseeing the relations between Stanley Media and Stephen Gordon closely and hands-on. Jonathan, what was Jonathan's state of mind at the time? Jonathan knew that Karen Smith was overseeing this matter carefully. He knew that Karen and Stephen and Peter Paul, the other principal at Stanley Media, had worked out an arrangement to bring the margin loans down. That's at 20 colon 54. He also knew that Karen or another manager had to approve the CMA overrides. So not only could Jonathan not affect an override on his own, but he had various times refused to authorize the CMA declines, which in fact shows that he was a team player for Merrill Lynch rather than a rebel or a miscreant. Smith testified at ER 20 colon 46 that Jonathan did not pass on the overrides when he didn't feel that there was enough information. And there's emails to that effect. ER 13 is an email where Jonathan says to another employee, don't pass on these checks. So when he had reason to pass up on the declines, he didn't recommend their overrides. Jonathan had no reason to suspect that there were insufficient deposits being made during the crucial two week period in which there was a flurry of activity. He saw many, many checks coming in and he also saw many checks going out. And he also knew that Karen Smith was overseeing the CMA, the relationship with Stanley Media very closely. The second piece of evidence that the government relies on for the check writing scheme is the false names on the accounts. There is no evidence and this is this sort of goes to the government's sort of late born theory of criminal negligence. They say that Jonathan never alerted Karen Smith or Merrill Lynch that there were false names on the 10 margin accounts. There's no evidence that the government offered that Jonathan knew that those were false names. And there was no evidence that Jonathan participated in the creation of those margin accounts. In fact, the government witness for the testified that Jonathan was not at all involved in the creation of those margin accounts. There was no evidence, moreover, for any type of deliberate ignorance. Jonathan never knew, never suspected that there were sham accounts involved, and he never took any steps to avoid finding that out either. I also addressed the money trailer earlier, so I won't belabor that. Finally, the false statement scheme. Count 14 is the facts from November 16th, which is ER, let's see, I think it's ER 16. I'm sorry, it's not ER 16, but it's the facts. It's ER 3, I think. The statements and the facts were true, and the government has a really difficult time, I think, trying to show that there was some element of falsehood in either of those two statements that are at issue. The first statement was that there were more than 5 million shares of unpledged Stanley Media stock on deposit at Merrill Lynch. It's, you know, ER 16 shows that there was more than 7 million shares on deposit at Merrill Lynch. The facts that Jonathan sent doesn't say that Stanley Media, the company, owns those shares. Rather, it just says that there are more than 5 million shares on deposit. So it is incontestably a true statement. Those shares belong to principals of Stanley Media who would be able and who offered to guarantee the loans from U.S. Bank if they lifted the hold. Regarding the second alleged false statement, there was a change in check clearing policy regarding Stephen. Jonathan said that in the letter. He did not make a claim that there was a change in check clearing policy regarding all of the regarding all of the clients of Merrill Lynch. He merely said that there was a change in policy regarding Stephen. Relatedly, the government claims that Jonathan didn't disclose the facts to U.S. Bank within the Merrill Lynch office, and that's simply not true. Merrill Lynch simply didn't produce it during the course of this investigation. This, I want to remind you, is a company who was criticized by the lower court for its monumental incompetence. There's no reason to assume that Jonathan, who sends out a fax to a third party, would think that the facts would not be found at some level or that he could keep it a secret. It just makes no sense. Regarding the oral false statements to U.S. Bank, I see my time is actually running up. I'll address any remaining issues if there's more questions. One question before you sit down. You raised some sentencing issues and I know you have you don't have time to argue now, but I'd be happy to address. How much time does your client have to serve? Well, he's already he was sentenced for two years in prison. He's already been incarcerated for longer than six months, which are arguments under Blakely anomaly would be that is too much time since the six month period elapsed. He's now being incarcerated in every day as a continuing violation. We would argue. Is there any amount of loss that was alleged in the indictment? There is not that that the jury's verdict would support in terms of where the loss would fall in the guideline. I don't believe that's there is your honor. I looked over the indictment. The indictment did allege certain amounts in various counts. It did. And the verdict came back as alleged. That's right. But there was no specific finding by the jury. And I think that well, I mean, but as the jury found, for example, one of the counts found him guilty as alleged that if you go to the indictment alleges a specific amount. Wouldn't that support at a minimum what you know, a loss based upon that? I don't I wouldn't agree with that, your honor. Tell me why. Well, I think the what's animating Blakely is that there would be specific facts determined by the jury beyond a reasonable doubt. And I don't think that this jury verdict supports the fact that there was, you know, X amounts of loss or that Jonathan was a more than a minimal role that his role in the office. I understand. I'm not talking about minimum role. I'm not talking about. Well, that but he also experienced that for that as well. I don't let me ask you one more question because I know Mr. Hoffman wants a chance to argue. Well, we weren't sure actually whether we were getting inside or not, actually. Under your theory, what was the maximum sentence your client should have been exposed to? Six months. And we would ask for, at the very least, bail pending any type of resolution by the Supreme Court determining Amaline was incorrectly decided or. Let me ask you this in a nutshell. What was the purpose of all this that was going on with your client, his brother? What was the purpose? Why were they doing all that? As I understand it, Stephen Gordon was interested in saving Stanley Media. And I don't I can't speak to what Stephen's motivations were. I know that Jonathan Gordon, my client, was trying to help his brother out. I don't think he was. He never had any criminal intent. I don't think the government's evidence shows that there was any criminal intent. Merrill Lynch benefited from Jonathan having a relationship that kept Stanley Media's accounts at Merrill Lynch. So there was a lot of information that was circulating. This was also during the period of the NASDAQ correction when when new media companies such as Stanley Media were being hit hard. And I think Jonathan Gordon was trying to be helpful to his to his brother. But I don't think that there was any record of Jonathan knowingly engaging in check hiding. I don't think there was any evidence that Jonathan knowingly made false statements or that the statements were false. And I don't think there's any record that Jonathan had the criminal intent to defraud Merrill Lynch of his honest services. Thank you. Thank you, Judge Braveson. Good morning, Your Honors. Paul Hoffman representing Stephen Gordon. And I'd like to reserve three minutes. Let me start on the sentencing. And I would concur in the response that my colleague has given on the amount of loss. I don't think that the that the verdict sustains the particular loss numbers. I think you'd have to go through. There were five. There was evidence and at the trial about who lost what in a very complicated situation. And I think that, in fact, we have argued about the loss calculation. And I think that you'd have to have a jury making decisions about the particular amount of the alleged certain amounts in the indictment. Well, they allege certain amounts. The verdict was was tailored to the accounts in the indictment. Is it your position that that the that the that the judge must also submit a special verdict? Well, I think with what our position is alleged in the indictment like that. What our position is under Emily and Blakely, the jury has to decide the critical factual elements that provide for the sentence. And there was nothing that is it in the indictment. And the verdict form says, but I don't think guilty as alleged what the government did not allege specific. And that's just one count with an amount alleged. I think that I think that if the if the if the trial was was was done on an indictment and which probably will happen in the future, where the government says a certain amount of loss was was done to a particular party. And the jury is asked in the course of the trial to consider not just the guilt or innocence, but in fact, that issue, because that wasn't really. Let me ask the question this way. Maybe this will help clarify. Maybe it won't. But did the jury instructions, you know, mention an amount as a necessary element of the offense? I don't believe so. No, but I think, you know, the elements of count one are, you know, intent to defraud or whatever it is, you know, and then a loss of not less than next dollars or something like that. You are. I'd have to check. But I don't believe so. I'm certainly not with the in a way that would satisfy Blakely and Emily. And from our standpoint, I mean, the case was not tried. It was before these cases came down. And so it wasn't tried based on that set of assumptions. It was tried the way cases were tried before Blakely. And I think that the what Blakely and Emily and say, it seems to me, is that the someone in Mr. Gordon's position is entitled to have the jury make those decisions rather than have the judge at sentencing saying, I've heard all the evidence and I find. In fact, there was fight in the sentencing hearing about the exact amounts of loss and changes from the pre-sentence report and lots of confusion. But what it was even between the judge and counsel in a long hearing afterwards is clearly the jury didn't make any decision about that. They didn't make a decision about the proceeds that were that Mr. Gordon allegedly got from this. So I guess under Castor, you'd like us to send at least a sentencing to the to the to the district court. That's basically. Well, let me ask you the same question. And I asked your co-counsel under your theory of what the jury found and didn't find. What is a maximum sentence? Six months. It's the same thing. Same thing. Yeah. I mean, his base offense level of six would give him six months and he's already served more than the six months. And so exactly under cash, there would be asking you to send that back if you affirm the conviction. And and let me in the in the time that I have remaining, just say that we do have one argument for reversing the conviction, and that is the admission of expert testimony that was admitted in violation of federal rule of evidence 704 B. And there are two elements to our argument there. One is that it's a clear violation of 704 B. The expert was asked whether there was check writing in this. This followed testimony about from the expert about the fact that check writing required intent. And it wasn't just check writing in the abstract. He. The jury knew that this expert knew that intent was part of check writing. And he was asked to say whether this defendant engaged in check writing. And he answered that he did engage in check writing, which can only mean that he had the right to testify that it was consistent with. Well, he is very different. Yes. I mean, he was asked the question that he was asked was, now, based on your review of the checking activity and your understanding of the facts of this case, do you have an opinion whether check writing was present in the case? Now, whether his answer was yes, based on my analysis of the bank accounts and detailed analysis of the account balances and deposits and disbursements, there was a pattern of activity among these bank accounts consistent with check cutting. The scheme was present in that it created the impression or illusion that there were funds on deposit in two or more accounts at the same time. And so he was asked whether there was check writing. And he said yes. And that was the central moment of his testimony. But he went on to describe what he meant by that. In other words, you know, mechanically. Well, he did. I mean, he certainly said that there was a pattern of activity. But what he was asked is that it was it there. And I think that's different from Morales, for example, where the question was the exclusion of an expert because of some hypothetical concern that the testimony might do this. But he was allowed to actually do it. And Doc was a central witness. He was the forensic accountant that pulled all of this complex web together. And what the government says is that it's harmless because there was effective cross-examination. But once the expert witness gets up there and says that the central issue in the case is decided based on his three month review of all these transactions, which obviously nobody else could do, there's a violation of that rule. And from our standpoint, in terms of the harmless error analysis, why couldn't anyone else do that? Why couldn't anyone else decide that it was check? Well, I think if the jury was allowed to make that decision without the expert saying that it was, that's a fair that's a fair argument. And then Mr. Gordon testified there was a completely alternate explanation of this entire set of events, which is completely consistent with him not having the intent required for these crimes. So that's it. Mr. Hoffman. Now, this expert said nothing about state of mind or intent. Right. But he did. He just. No, he went to the pattern. This is you know, and this is this pattern is consistent with check. And he said nothing about state of mind. And to me, it doesn't seem to be really different than any of the kind of what you might call modus operandi type of. Well, I think that if he was asked the question is, is what you observed consistent with check cutting? If that was the question that he answered, I think he is permitted to answer that question. But he didn't answer that question. The question that he asked is, was check cutting present in this case? That's that under under Watson's. And it's a question plainly designed to talk about the mental state, because he had already defined check cutting as being something that required intent. I mean, it wasn't that he just picked it out of the air prior to this. He already testified it left under the government's examination that intent was required for check cutting. And then he's asked this question. And there's a timely objection to it. And he is permitted to answer the central issue in the case. To what extent, if you recall, did the government rely on this expert testimony and closing argument? They in the closing argument, there are three pages of argument that rely on Dobbs testimony. He did. As I read the testimony, the government did not rely on this particular answer in the testimony. But they certainly relied on that to a considerable degree. They didn't say they didn't say in so many words, as Mr. Dobbs told you, there was check cutting. They I think their argument with respect to that was proper in that sense. But I think you can't unring that bell. And that's why it was objected to. And that's why we say it was a violation. And I think it's particularly important in a case like this where where you have lots of testimony, for example, from Karen Smith about the fact that she came up with the idea to have all these margin accounts. She came up with this idea to benefit Stanley Media because it was a big client. And they knew all these what all these checks were. And you have a completely consistent testimony for Mr. Gordon believing that there was more than enough stock in a publicly traded company to cover all this. And that he wasn't writing checks for insufficient funds. And that when he was writing checks between accounts, he was doing dealing with maintenance calls. The jury could well have believed that and was entitled to believe that. And the government concedes that they could have believed that in their in trying to get around this issue. But he was disadvantaged. You have Stephen Gordon versus forensic accountant that knows everything about check cutting, saying that it was check cutting. And I hope that I can preserve just a little bit of time to rebut. Thank you. Good morning. May it please the Court. My name is Elaine Liu and I represent the government in this appeal. I'd like to first address Jonathan Gordon's sufficiency of the evidence claim. The government would submit that there was plenty ample of ample evidence from which the jury could reasonably conclude that he had the fraudulent intent and the knowledge, the guilty knowledge necessary to commit these crimes. First, there was a steady stream of under-the-table payments, the most notable of which was the $200,000 that went from Stephen to Jonathan's escrow account. And most significantly, the circuitous route that that $200,000 took from Stephen Gordon's Merrill Lynch account to Stephen Gordon's U.S. Bank account and then from there to escrow. Now, Stephen Gordon claimed that it was a pain in the neck to have sent it directly, but that was directly contradicted by Merrill Lynch's witness at Government's Excerpts 183. She said that that would have been the most direct and easy way to do it, just to send the wire directly from Merrill Lynch to the escrow account. And there seems to be some dispute as to whether Stephen Gordon was required to disclose this receipt of $200,000 from his brother under Merrill Lynch policy. So the government would refer the court to the Government's Excerpts at 102 to 105 for that point. Now, citing Stephen Gordon's testimony, both defendants characterized this $200,000 as a loan from Stephen to Jonathan. And, in fact, Jonathan implies that the government's own witness conceded that the Merrill Lynch notations in its files show that this was a loan. But, in fact, that's somewhat misleading because the portion that Jonathan cites to in his brief on page 14 in his reply brief, the Merrill Lynch witness was testifying only as to certain notations on Jonathan's EARS report. And that was, of course, the report that Merrill Lynch generated based on the bank accounts or the accounts that their financial consultants held at Merrill Lynch. And Karen Smith, his manager, had noted on one occasion that there was this check for $21,000 that was deposited into his account. She asked him what it was for and who it was from, and he said it was a loan from his brother for escrow. But that was pertained only to the $21,000 that actually hit Jonathan's account at Merrill Lynch. The $200,000, the additional $200,000 that Stephen Gordon provided never hit that account because, again, because of that circuitous route. And so it never showed up on his EARS report. And if there's any doubt about that, the Court can look at Government's Exhibit 330, I think it was 330, the EARS report, or it's 333. And Karen Smith also testified that she never knew about that $200,000, Government's Excerpts 476 through 78. The defendants also erroneously contend that it's uncontroverted that that $200,000 was a loan. Well, that ignores evidence that the government introduced to contradict that. And namely, when Stephen was arranging for this wire from U.S. Bank to Jonathan's escrow, one of the U.S. Bank employees had asked him about this particular $200,000 wire. And that's at Government's Excerpts 33. Stephen Gordon told this U.S. Bank employee that he was purchasing a house for his brother. The government followed up and asked, well, did Stephen mention anything about this being a loan to his brother? And at Stephen Gordon's excerpts, page 79, the witness replied, no. He said it was to purchase the house. There were other efforts that Jonathan made to conceal the money from Stephen Gordon. From January through June of 2000, Merrill Lynch did not review deposits into the accounts of its financial consultants. Well, in June, it began to do that. And Jonathan's manager noticed two times on his year's report that there were check deposits from Stephen. And those were the ‑‑ Karen Smith, his manager, testified those were the only deposits that she knew about. That's at Government's Excerpts 473 to 74, 909 and 917. She questioned Jonathan again about that $21,000 deposit, was told that it was a loan from his brother. And Jonathan did not like being questioned about the sources of deposits into his account. And that was the very last check that was deposited into Jonathan's Merrill Lynch account. Because the same day that that $21,000 check was written, Jonathan opened a bank account elsewhere where Merrill Lynch could not monitor those deposits. So the evidence shows that at the very first instance that Jonathan realized that Merrill Lynch would catch on to his under the table payments, he took efforts to conceal them. And based on this precise timing, the jury could reasonably infer his fraudulent intent, an intent to conceal from Merrill Lynch. There's also ample evidence found in Jonathan's role in recommending the override of CMA declines. And in doing so, he was acting directly against the interests of Merrill Lynch, because throughout this check-kiting scheme, even though ultimately at the end of the day Merrill Lynch did not suffer losses from the check-kiting scheme, throughout the scheme Merrill Lynch was exposed to a significant risk of loss. And whenever there is a check-kiting scheme, somebody is stuck holding the empty bag at the end of the day. And without Jonathan's recommendation of these overrides, all those checks would have bounced. Now, Jonathan tries to minimize his own role with regard to these CMA declines. And he claims that, well, Karen Smith had his manager was hands-on and she oversaw all the activity in these accounts. Well, that may be true that she monitored the debit balances in these accounts after mid-October and she was hands-on, but it was still Jonathan who brought her these CMA declines with recommendations to override and to pay checks. If there's any doubt about that, Government's Exhibit 380 showed 271 instances where he did that. Now, Jonathan also claims he didn't have any intent in those CMA declines because he, too, returned checks. And he was a real team player. Well, if the jury wanted to get a sense of what a true team player he was, the jury only had to look to Government's Exhibit 376, which starts at Government's Excerpts 1010. And that was a summary chart that summarized the various CMA declines that Jonathan exercised during this period. And it's clear from there that out of over 270 times, he was a team player twice in that he returned checks only two times. The jury could have also inferred fraudulent intent from the things that Jonathan Gordon knew that he was not supposed to do, and yet he did. For example, he knew that he was not supposed to be allowing checks to circulate between these accounts. One Merrill Lynch manager testified that Merrill Lynch policy prohibited that. That's at Government's Excerpts 184 and 185. And if that policy were not clear to Jonathan, well, certainly by August of 2000, he was explicitly informed of that. His manager noticed that there was some circulation of funds between these accounts, and she told Jonathan at that time that it was not acceptable, that he was not to allow this to continue to allow checks to circulate between these accounts. And that's at Government's Excerpts 493 and 496. Well, in response to this, Jonathan raises a couple of disingenuous claims. The first one being that he claims, well, he did inform Karen Smith that funds were being circulated between these accounts. Just look at the CMA declines. And Karen Smith did testify, yes, that at times he did notify her through notations on the CMA declines that funds were being transferred from one account to another. There was a particular box on the CMA decline form that could be checked off to show that funds were being transferred. Well, if you actually review the transfer, the CMA decline forms themselves, which are summarized at Government's Exhibit 376A and found at Government's Excerpt 1018, the summary chart there shows that during the check height, he executed and signed off on 271 CMA decline forms, and only on four of those did he identify that this was due to a transfer between accounts. So that was less than 1.5 percent of the time. The second disingenuous claim that Jonathan raises is that he, too, like all the other Merrill Lynch witnesses, he didn't know that funds were being circulated between these accounts. Well, there are two reasons why the jury could infer that he did know that funds were being circulated. First, it took a Merrill Lynch employee from a different branch office, John Edwards, who had no responsibility over these accounts to bring to Jonathan's manager's attention the unusual cycling of checks between these accounts. Edwards accessed the Merrill Lynch computer system, and he found out that there were no funds, there was no equity, there was no credit in these accounts to support the writing of all these checks, and he immediately suspected check-kiting. Now, as a financial consultant, Jonathan had access to the same information in Merrill Lynch's computer system, and, in fact, it was his responsibility as a financial consultant to monitor and be in charge of these accounts. In fact, every single CMA form that Jonathan signed off on during this time period, he had to certify that he had reviewed the situation and assumed responsibility of the above checks.  Instead, he signed ever-increasing numbers of CMA decline forms for ever-increasing dollar amounts. There's another reason why the jury could have reasonably inferred that he knew all along that funds were being circulated. After Karen Smith started asking him about the source of the deposits into the Merrill Lynch accounts, Jonathan started to show her official bank checks, certified cashier's checks, and this made it look like there were real funds, certified funds coming in from an outside source. Well, Jonathan never told Karen Smith, his manager, that these U.S. bank cashier's checks had been purchased using checks drawn on the Merrill Lynch accounts. Now, in response to this, Jonathan claims he didn't know that Merrill Lynch checks were being used to buy those U.S. bank checks, but in fact, the jury could very well have reasonably inferred his knowledge by looking at his reaction when U.S. Bank called on November 16th. The whole purpose of that call was to figure out why it was that all these Merrill Lynch checks that had been negotiated at U.S. Bank were being returned to U.S. Bank. So Jonathan didn't know before this. He was certainly made aware no later than that phone call that hundreds of thousands of dollars of Merrill Lynch checks had been deposited into these U.S. Bank accounts, which was the very same institution where all those cashier's checks came from that he showed Karen Smith. And so this certainly should have closed the loop on any information gap that he had. If he really didn't know before this that those Merrill Lynch checks were being used to purchase the cashier's checks that you see here, at U.S. Bank, one would have expected him to express some surprise to U.S. Bank. Why are you getting Merrill Lynch checks? What Merrill Lynch checks? And you'd expect him to fill U.S. Bank in on the loop. You guys at U.S. Bank, you have a real reason to be concerned because those cashier's checks that are being purchased at your bank, they're being deposited at our bank, which means that there aren't any real funds in it. It's just checks cycling back and forth. More importantly, you would have expected Jonathan to run to Karen Smith and tell Karen, I've got terrible news. It turns out that those cashier's checks that I've been showing you, it turns out that those aren't real outside funds at all, because at the same time that this is going on, hundreds of thousands of dollars of Merrill Lynch checks have been negotiated at U.S. Bank. Well, Jonathan does the opposite of this. He tells U.S. Bank not to worry because there are many funds and shares to cover the overdrafts at U.S. Bank. And that's at Governments Excerpts 208 to 210 and 621. He doesn't tell U.S. Bank that Merrill Lynch is no longer honoring checks on these particular accounts. Instead, he tells them about a change of policy, that Merrill Lynch was now placing a two-week hold on all customer accounts. And he agreed with one of the U.S. Bank representatives that this was causing chaos and problems for his other customers. And that's at Governments Excerpts 13 through 14, 45, 200, 205 to 206, 212 to 213, and 621. And most importantly, Jonathan never mentions to Karen Smith that U.S. Bank had called about hundreds of thousands of dollars of checks, Merrill Lynch checks that had bounced at U.S. Bank. He did take the time to keep his brother informed of all of his communications with U.S. Bank, because one minute after he sent his fax to U.S. Bank, he sent a copy of his fax to his brother. Now, Jonathan was trained earlier that year. He knew that Merrill Lynch policy required him to show his manager that letter, any outgoing correspondence before it went out. And he didn't. Instead, he conceals the fact that he ever sent that fax. He never asked for approval from his manager. He never mentions this phone call that he had with U.S. Bank. And he never keeps a copy in Merrill Lynch's files, as he's required to do. Now, the Court has already pointed out that Jonathan has cited some alternative explanations for the evidence. For example, his claim that perhaps the $200,000 was a loan, and Stephen Gordon testified to that. Or that Stephen Gordon didn't transfer the money directly into Jonathan's escrow because it was a pain in the neck. Well, at most, these arise to the level of evidentiary conflicts that the Court must assume were resolved in a manner that supports the verdict. Jonathan also implies that while Jan Van Hout, who was one of the U.S. Bank witnesses, she must have had a faulty memory because if you look at her email, there were problems with her email. At most, this would constitute impeachment evidence that goes to her credibility, which, again, the Court must assume was resolved in a manner that supports the convictions. And finally, Jonathan urges this Court to draw far better inferences. The fact that his facts to U.S. Bank never showed up in the Merrill Lynch accounts, he claims Merrill Lynch may have just lost that facts. Well, that's one inference to draw, but that is certainly not the only inference to draw. And the issue here is not whether the evidence excludes every single possible hypothesis other than guilt, but could the jury reasonably and rashly conclude from the evidence that was presented that he had the fraudulent intent necessary to commit these crimes? And the government would submit that there was ample evidence to support his convictions. With regard to Stephen Gordon's objection to the expert testimony, the test is well-established. Does the expert's testimony, if credited, necessarily compel a certain conclusion regarding the defendant's And the expert's first part of his answer to this question was. What besides a direct question such as, in your opinion, did the defendant have the requisite mental state? What besides that kind of question would fit into this necessarily compel? There must be something other than that, right? Yes. If, for example, the government had asked something like, was there only one possible explanation for this pattern of activity that you saw? I would concede, and if the expert had said yes, there was only one possible explanation, there could be no legitimate reason and there could be no innocent writing of all of these hundreds of checks, then, yes, I would concede that that would fall under the prohibited opinion that an expert may not testify about. But that was certain. All right. Now, the defense that was put on had to do with an alternative explanation. Yes. Right. Yes. And that was fully argued to the jury? Yes. And you did rely to some extent. Which one of you, I don't know, made the closing? I did the closing, Your Honor. Whoever made the closing relied to some extent on Dopp's testimony, right? Yes, Your Honor. However, what was relied on regarding Dopp's testimony was his testimony regarding the characteristics that you commonly see in check-cutting schemes, that there are many conduit accounts, there's a lot of inter-account activity, cycling of checks between accounts, a high volume of activity, mirroring of deposits with disbursements, and the purchasing of cashier's checks to make it look like there are real funds coming from the outside. Absolutely, the government relied on that portion of Dopp's testimony, but there was nothing erroneous about that portion of his testimony. But it wasn't relied on for purposes of establishing the mandrea. No. Well, honestly, I haven't read the closing argument for a while, but I certainly don't remember ever saying, well, ladies and gentlemen, Paul Dopp told you, the expert told you, that there could only be one reason for writing all of these checks and cycling them and funneling them between all of these accounts. I certainly didn't argue that. In fact, I don't even remember – I don't remember alluding at all to this portion of the testimony that was objected to. And in any event, if it was not abundantly clear from the direct testimony, it certainly was made abundantly clear from the cross-examination, the limits of this expert's testimony. And he considered that he never talked to Stephen Gordon, so he, you know, he couldn't know if Stephen Gordon may have had some other legitimate purpose. But because he didn't talk to them, talk to Stephen Gordon, he couldn't – he didn't know. He also agreed that if you were writing checks between accounts to bring down loan balances, sure, that could be a legitimate business case. What was the jury supposed to take from his definition of check hiding, Mr. Dopp's definition of check hiding? Well, he said – he says it consists of a pattern of activity where checks are issued in deposit and reissued among various controlled accounts with the intent to misrepresent. The jury – So when he – so when he answers the question, yes, then offers his explanation of consistent with, isn't he also saying it's consistent with the intent to misrepresent? Well, I don't think that there's anything wrong with him saying that it was consistent with – consistent with the check hiding scheme or consistent with an intent, as long as he didn't say – he didn't say that that was the defendant's actual intent. And that's what distinguishes – That's pretty close. Well, in any event – Let me ask you this. Why do you need a check hiding expert? Well, for two – Look, I mean, can't you just put a diagram on a board or a chart and just show what this activity is and the timing and, you know, how the money goes around? Well, a few things. One, a lay person would not be familiar with what things to look for in a check hiding scheme. For example, a high degree of check cycling between accounts. To a lay person, it's not immediately apparent that that is one characteristic of a check hiding scheme. What does the – what does the instruction tell? I'm sorry. Which instruction? The jury instruction. What does that say? The – Check hiding. I don't think that there was an instruction defining – you mean the court's instruction? No. I don't recall there being a court instruction defining check hiding. The court's instruction defines the elements of the charged offenses. Of the crime charge in the indictment, right? Yeah. Which was wire fraud. Which is fraud. Wire fraud, conspiracy. So why did he give that definition of check hiding? It requires an intent of the fraud. Because with his testimony, he's defining if you did – if you did write all of these checks with the intent to artificially inflate account balances, then that's check hiding. But he did not say that Stephen Gordon had that intent in this case. In fact, he made clear that he was not. But he showed all of this. He showed all of this activity and everything else. What else is the jury supposed to conclude? He can – the jury could have still – in fact, he testified at one point. You don't think jurors don't know what check hiding is? I'm not sure. Before I tried this case, I'm not sure that I understood fully how to exploit the float between – by cycling checks between accounts. So honestly, I don't. You're a sweet, innocent girl. You don't know. Well, and the other part of – The other part of this expert's testimony was that he analyzed all these bank accounts. I mean, there were multiple, multiple account statements and checks. And it was necessary for him to analyze these and sort of summarize them in a sense that made – in a form that made sense to the jury. But why couldn't – why couldn't you do that on a chart? You know, you just put – you got the chart up there. And then you put – show all these different incidents, what happens, and then argue. Why do they do all this? There has to be a reason for it. That's one way to try it, Your Honor. I mean, that's the way they used to do it in the old days. So, Garrett would just admit that it's – that may be a better approach to do it. However, it's not error to do it this way either under Rule 704B, especially when this expert explicitly – he was – he corrected defense counsel in one instance, where defense counsel was trying to ask him, are you saying that there was no other purpose for all these conduit accounts other than to inflate account balances? And he corrected it and said, no, not in those words. I said that a check-hiding scheme could be used to inflate account balances. And, in fact, in another point, he was asked – defense counsel asked him, isn't it true that somebody could have done all of the things that Stephen Gordon did, written all of these checks, circulated them between accounts in order to avoid maintenance calls, and the end result would be that there would be 90 percent of these characteristics that you describe as being in check-hiding schemes, and yet there would be no check-hiding scheme because Stephen Gordon did not have the intent to defraud. Well, I'm sure part of the answer to Judge Bragerson's underlying question is, you know, you don't know at the beginning of the case how sophisticated the jurors are. You just want to make sure they understand what check-hiding is, right? Yes. That's part of it, I think, obviously. There's a lack of faith in the jury system. But to pass on to another subject, since maybe your time is getting close to being over, I just want to make sure that – I think this is right from a 28-J letter. You really don't disagree with the defendants that, as far as the sentencing issues are concerned, this is a Castro-type case, right? And it really should go back to the district court to determine what to do after Booker and Fanfana decided. I guess the only point of disagreement is I do believe that the indictment did charge certain dollar amounts for certain counts, but I do agree that the jury was never instructed that loss was an element of any of these offenses or that they had to find loss. Nothing in the instructions mentioned, you know, a requirement of finding any amount, right? No. I don't believe so. Okay. Thanks. Thank you. Your Honors, I beg your patience. I realize this has been dragging on. I'll try and be brief with just a few points. I want to stress first the importance of the standard of review here. Ms. Liu for the government has been saying, could a jury reasonably conclude? And that's only half the game. The other half of the game is beyond a reasonable doubt. And that's part of the standard under Jackson. That's part of the standard under Bishop. And we cannot forget that the fact that there might be some conflict in evidence is not simply one that we read as being supporting the verdict under all circumstances. I didn't give the jury for all these machinations. I'm sorry? What reason did you give the jury for all these machinations? Well, Your Honor, I actually didn't try the case. What would I give them? Well, I think the – I would prefer to actually look at it point by point because I think that if you look at the gestalt, it can appear to be machinations, but you also have to understand that each of these things has a plausible alternative reason. Sorry. The overall feeling of it. The overall feel of it. What explanation was made by defense counsel? I think defense counsel vigorously proposed that the money was to help Jonathan out with the purchase of a house. And I don't think that there's – you know, the suggestion that – We went through all this so he could purchase a house. No, are you talking about the 200 – are you talking about the check hiding during – the alleged check hiding during October, November? Yeah. Well, I think that that was done in large – I can't speak to what Stephen was doing. I can speak to what Jonathan was doing. And Jonathan's mind was he was trying to help his brother out in a time where there was a lot of turmoil at the company. And I think he, you know, basically was trying to help his brother out, help a client out during that situation. But I think it's important – it's crucial, Your Honor, to understand that Jonathan's knowledge at that time was quite limited as to what the arrangement was to bring down the margin loans, because that was an arrangement made between the principals of Stanley Media, Peter Paul and Stephen Gordon, as well as Karen Smith. They knew what was going on. In fact, Ms. Liu points to the fact that it was John Edwards who brought this to the attention. John Edwards, who's not at the Century City office of Merrill Lynch, but is at the Encino. Not the vice presidential candidate. No, not the vice presidential candidate. But, in fact, that's actually really suggestive of how complex and complicated and convoluted the scenario was, right? The fact that nobody in the Century City office, none of Jonathan's managers, whether it was Michelle Avon or Karen Smith, were involved, you know, intimately in the case, that they didn't see that there was check-kiting going on. I mean, why would that redound to Jonathan's mens rea? I mean, it just doesn't make sense. The fact is that someone else outside who wasn't involved was able to see that. I mean, if you're enmeshed in this complicated scenario of the 12 business days between mid-October and early November, all of a sudden, you know, you might lose the forest for the trees, right? But that's not what happened. I mean, from Jonathan's perspective, he didn't have all the information that his managers did. So I would point to that. And I would trust that forests are gone, so we don't have to worry about that.  The other point that I want to mention, and I'll let my co-counsel rebut, is the government mentions that there's something devious about the fact that Jonathan started a new bank account at a different bank in June or July. Well, the point is that at that point, Jonathan, and this was the testimony that was uncontroverted, Jonathan knew that he wanted to go to a new brokerage house. He knew that he had developed a substantial book of business and that he would be given upwards of a half a million dollars. I'm sorry? He's going to get this big bonus. He's going to get somewhere around a half a million dollars in a bonus. And so why would he want to have to answer questions, you know, from his manager regarding money that he didn't have to report under the Merrill Lynch regulations? It was at another account. There were many other employees who had other accounts at other places. And Karen Smith testified to that. It was only if you had a trading account that you were obligated to report this type of information. So he has this money. Why? You know, think about it from his perspective. In June, July, three or four months before Merrill Lynch precipitates the cash crunch, because of Karen Smith's mistake in circumventing the New York directive to not extend more than a half a million dollars through the creation of these margin accounts, in June or July, Jonathan is thinking, well, you know, I'm going to be leaving Merrill Lynch soon, and I don't want to have to really answer all these questions of why am I getting payments. I mean, from his perspective, it's, you know, I don't want to rock a boat that I don't need to rock. So there is a plausible answer for each bit of the evidence the government provides, and the Bishop case provides that when there is equipoise between the evidence, the court below is required to grant the Rule 29 motion. And I'll just close by noting that the court said after the government rested, this case against Jonathan is really pretty weak. You cannot square that with the constitutional obligation to satisfy the beyond-reasonable-doubt standard. And with that, I'll close. Thank you. I would actually add one last thing, which is we would renew our motion for the interim bail on the sentencing issues. Thank you. I just have three quick points. One is to just point out I was asked about where there were amounts in the indictment. In Paragraph 24, there are some loss amounts with respect to U.S. Bank. There aren't any loss amounts with respect to Spear Lease, which is the bulk of it. And I think as counsel for the government has indicated, there's no jury instruction. So I think that that sort of underscores why you can't put a pre-Blakely case into a post-Blakely mold, I believe, in terms of this. I've thought a lot about this, Mr. It's a difficult question, I think. But it seems to me that you can't sort of take a jury verdict that occurred before this with some numbers in it that doesn't really. It depends on what was alleged and how it was alleged. But I think in particular, this indictment is not the kind of indictment that really focused the jury's attention on. With respect to the expert witness, I'm not sure it's an element of the office, but that's for another day. Yes. Yes, sir. With respect to the expert witness, I don't know that between the definition of intent that the expert gave and answering the question directly, you can do much more than say there's no non-fraudulent check cutting. I mean, by definition, if check cutting exists, there's fraudulent intent. If there wasn't fraudulent intent, then it would be just meeting maintenance calls, which is what Stephen Gordon testified to and what the alternative theory was of the entire case. So it's either yes or no. Either Stephen Gordon is right and he's an innocent man or he's wrong and it's check cutting. And what the expert was asked and what he answered is that it's check cutting. With respect to Judge Pragerson's question about what is this all about, Stanley Media was doing very well. It was a big company. Stanley's a very well-known guy. They were making deals with studios. They had lots of stock. It was publicly traded. The margin accounts were created at Karen Smith's suggestion, knowing that they were controlled by the same people and supported by Stanley Media stock. And what happened is that she had flaunted a restriction on credit by the New York office, and then when that was found out about, she asked them to reduce the amount in these accounts but never said that they could stop writing checks on it. In fact, checks were approved even after the date she said there were no checks that were going to be done. And so from Mr. Gordon's standpoint, at least from his alternative explanation before the jury, from a harmless error analysis, he believed that there was more than adequate credit on the stock that Merrill Lynch had to cover the checks that were being written. And had the checks not been stopped by Merrill Lynch, none of the losses would have occurred at all. And, in fact, they were waiting for a $40 million infusion of capital from the Astor Group on December 1st, only two weeks after the plug was pulled. And so what was happening is they were trying – they had a cash crunch. Merrill Lynch was causing that to be difficult, and they were trying to keep the company alive and meet payroll. That's what was going on. And from Stephen Gordon's standpoint, he wasn't doing anything fraudulent. Everything was above board with Merrill Lynch and Karen Smith. They knew about the inter-account transfers. When they was told not to do it, he didn't do it. And so that's what it was all about. And that was a perfectly plausible legal explanation that I think means, from the standpoint of this error, that once you allow the expert to say that it's check-kiting, it just knocks the rug out of that alternative explanation. Thank you, Your Honor. Don't forget your watch. Thank you. Okay, matter submitted. Down to U.S. v. Jordan.
judges: Pregerson, Tashima, Paez